**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

CresCom Bank, successor by merger to )
Community FirstBank, )
 )
                    Plaintiff,        )        Case No.: 2:12-cv-00063-PMD
 )
           v.                          )        **ORDER**
 )
Edward L. Terry; Harris Street, LLC, n/k/a )
CCT Reserve, LLC; Sugarloaf Marketplace, )
LLC; and CCT Reserve, LLC, )
 )
                    Defendants.        )
————————————————————)

This matter is before the Court upon cross motions for summary judgment filed by
Defendant Edward L. Terry ("Terry") and Plaintiff CresCom Bank ("CresCom").  For the
reasons that follow, the Court denies in part and grants in part Terry's motion and grants
CresCom's motion.

**BACKGROUND**

Plaintiff CresCom is the successor by merger to Community First Bank.  At all times
relevant hereto, Defendant Terry was the sole member of three entities: Harris Street, LLC;
Sugarloaf Marketplace, LLC; and CCT Reserve, LLC.  These entities were in the business of
purchasing and developing land.  On or around February 4, 2011, Harris Street, LLC, and
Sugarloaf Marketplace, LLC, were merged into CCT Reserve, LLC, with the surviving entity
being CCT Reserve, LLC (collectively referred to as "CCT").

From 2006 through 2009, CresCom made a number of loans to CCT for the purchase and
development of tracts of land in South Carolina.  The four underlying obligations are: (a) Note #-

----2622, entered into by Harris Street, LLC, on or about February 1, 2006, as modified; (b) Note #-----2718, entered into by Harris Street, LLC, on or about April 12, 2006, as modified; (c) Note #-----2911, entered into by Sugarloaf Marketplace, LLC, on or about October 25, 2006, as modified; and (d) Note #-----3572, entered into by CCT Reserve, LLC, on or about June 25, 2009.[1]

Each of these loans was personally guaranteed by Terry. *See* Guaranty, dkt. 51-15, 51-26, 51-30, 51-31, 51-32, 51-33, 51-34, 51-35 (hereinafter, "Guaranties" or "Guaranty Agreements"). Terry signed the various Guaranties in Georgia. Each guaranty is "an absolute, unconditional and continuing guaranty of payment." Guaranty ¶ 2. Under the terms of each Guaranty, the guarantor "waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full." *Id.* ¶ 7. Moreover, the guarantor "waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness." *Id.* ¶ 11. Paragraph 8 of each Guaranty states that the guarantor's obligations remain, even in the event the obligations of any other obligor are discharged in bankruptcy. "'Indebtedness' shall include post-bankruptcy petition interest and attorneys' fees and any other amounts which Borrower is discharged from paying or which do not otherwise accrue to Indebtedness due to Borrower's discharge." *Id.* ¶ 8. Finally, Paragraph 5 of each Guaranty requires the Guarantor to "pay or reimburse [CresCom] for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by

---

[1] On or about June 19, 2009, CresCom, CCT, and Terry signed a written commitment letter under which CresCom agreed to extend another line of credit to CCT in the amount of $750,000.00 and to make various amendments to the loan documents for Loan Numbers 2622, 2718, and 2911. On or about June 25, 2009, in accordance with the June 19 commitment letter, CresCom extended the line of credit to CCT in the amount of $750,000.00 (Loan No. 3572). CCT used this new loan to pay the accrued interest due on the previous loans from CresCom as well as to cover various expenses for real estate developments. Also on or about June 25, 2009, in conjunction with Loan No. 3572, Terry was required to execute several new guaranty agreements, and CresCom, CCT, and Terry entered into another written contract, titled "Amendment to Loan Agreements and Mortgages to Provide for Cross Default" ("Loan Amendment").

Lender in connection with the protection, defense or enforcement of" the guaranty. *Id.* ¶ 5. The underlying loan documents also include provisions for the payment of attorneys' fees and costs.

The maturity date on each of the loans was June 18, 2011. The outstanding principal, as well as charges, fees, and interest accrued were due and owing on that date. Neither CCT nor Terry made the payments, and the failure to pay was an event of default under the notes, as renewed and modified, the respective mortgages, and the Guaranties.

On January 5, 2012, CresCom filed the instant suit against CCT to recover on the four loans. CresCom also sued Terry as the guarantor of the promissory notes. The first four causes of action in CresCom's complaint allege claims against CCT based on the promissory notes executed by CCT. The fifth and final cause of action alleges a claim against Terry based on the Guaranties and seeks a monetary judgment against him.

On August 31, 2012, CCT filed a Chapter 11 Petition in the United States Bankruptcy Court for the Northern District of Georgia. *See In re CCT Reserve, LLC*, C.A. No. 12-71670-PWB (Bankr. N.D. Ga.). CCT's schedules included the four loans referenced above. On March 14, 2013, the Bankruptcy Court entered orders confirming CCT's bankruptcy plan and determining that the value of the collateral securing CresCom's loans totaled $2,551,000.00. As a result of the CCT bankruptcy, and pursuant to the orders of the Bankruptcy Court, the properties securing the underlying note obligations were conveyed to CresCom. The Bankruptcy Court's orders further determined that the total amount of CresCom's remaining unsecured or deficiency claim, after crediting the value of the real estate conveyed to CresCom as part of the plan, was $1,121,029.00. Pursuant to CCT's bankruptcy plan and the Bankruptcy Court's orders, CresCom's claims against CCT were discharged. CresCom did not appeal the Bankruptcy Court's orders.

Terry and CresCom have filed cross motions for summary judgment seeking resolution of the cause of action against Terry based on the Guaranties.  The motions have been fully briefed and are ripe for judgment.

## JURISDICTION

This Court has subject matter jurisdiction over this matter based on 28 U.S.C. § 1332, as there is complete diversity of the parties and the amount in controversy exceeds $75,000.  CresCom is a corporation organized under the laws of South Carolina with its principal place of business in Charleston County, South Carolina.  Defendant Terry is a citizen and resident of Florida.  Defendant CCT is a limited liability company organized under the laws of Georgia with its principal place of business in Georgia.  Finally, CresCom seeks damages in excess of $75,000.  Therefore, this Court has diversity jurisdiction over this case.

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  All evidence should be viewed in the light most favorable to the nonmoving party.  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."  *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).  Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

<u>**ANALYSIS**</u>

**I.       Choice of Law Determination**

As an initial matter, the Court must determine whether South Carolina or Georgia law governs the Guaranty Agreements.    A federal court sitting in diversity must apply the choice of law rules of the state in which it is located.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Spartan Iron & Metal Corp. v. Liberty Ins. Corp.*, 6 F. App'x 176, 178 (4th Cir. 2001).  Under South Carolina's choice of law rules, "[u]nless the parties agree to a different rule, the validity and interpretation of a contract is ordinarily to be determined by the law of the state in which the contract was made."  *Unisun Ins. Co. v. Hertz Rental Corp.*, 436 S.E.2d 182, 184 (S.C. Ct. App. 1993); *see King v. Marriott Intern., Inc.*, 520 F. Supp. 2d 748, 753 (D.S.C. 2007).  In general, choice of law clauses are honored in South Carolina, unless application of the designated foreign law would result in a violation of South Carolina public policy.  *Team IA, Inc. v. Lucas*, 717 S.E.2d 103, 108-09 (S.C. Ct. App. 2011); *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 728 (D.S.C. 2007).

In this case, the parties included a choice of law provision in each Guaranty, agreeing that the contract would be governed by the laws of the State in which it is executed.  Paragraph 13 of each Guaranty Agreement provides, in pertinent part:

> This guaranty shall be enforceable against each person signing this guaranty . . . .
> This guaranty shall be effective upon delivery to Lender, without further act,
> condition or acceptance by Lender, shall be binding upon the Undersigned . . . and
> shall inure to the benefit of Lender and its participants, successors and assigns. . . .
> This guaranty shall be governed by the laws of the State in which it is executed.
> The Undersigned waives notice of Lender's acceptance hereof.

The parties disagree about the meaning of the term "executed."  According to Terry, Georgia law governs CresCom's claims on the Guaranty Agreements because Terry executed all of the Guaranties when he signed them in Georgia.  CresCom, however, contends that South

Carolina law governs the claims because the Guaranties were not fully executed until they were delivered to the lender in South Carolina.  Therefore, the choice of law determination depends on the meaning of "executed" as used in the Guaranty Agreements.

Under South Carolina law, a guaranty is a contract subject to the rules of contract interpretation.  *In re Southco, Inc.*, 168 B.R. 95, 99 (Bankr. D.S.C. 1994).  "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect," *McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009), and the court must "enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully," *Ellis v. Taylor*, 449 S.E.2d 487, 488 (S.C. 1994).  "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (S.C. Ct. App. 1997).  The question of whether or not a contract is susceptible of more than one interpretation is a question of law for the court.  *Id.*  "Whether a contract is ambiguous is to be determined from the entire contract and not from isolated portions of the contract."  *Farr v. Duke Power Co.*, 218 S.E.2d 431, 433 (1975). "Even if an ambiguity exists in a contract, extrinsic evidence may not be considered if the ambiguity is a patent ambiguity." *Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85, 95 (S.C. Ct. App. 2011).  "A patent ambiguity is one that arises upon the words of a will, deed, or contract."  *Id.*  A latent ambiguity, on the other hand, "exists when there is no defect arising on the face of the instrument, but arising when attempting to apply the words of the instrument to the object or subject described."  *Id.*

Interpretation of an unambiguous contract, or a contract with a patent ambiguity, is for the court. *Id.*

The Court concludes that the term "executed" is ambiguous as used in the choice of law provision.  Black's Law Dictionary defines "executed" to mean either (1) "(Of a document) that has been signed"; or (2) "That has been done, given, or performed."  Black's Law Dictionary 609 (8th ed. 2004).  Similarly, Black's Law Dictionary defines "execute" to mean, *inter alia*, to "make (a legal document) valid by signing" or "to bring (a legal document) into its final, legally enforceable form."  *Id.*  Based on the above definitions, the Court finds support for both parties' positions regarding the meaning of the choice of law provision.  The provision could be read to mean—as Terry urges—that once the Guaranty "had been signed" or made "valid by signing," it was executed.  In that case, Georgia law would govern.  However, when read in the context of Paragraph 13 as a whole, the provision could mean—as CresCom argues—that the Guaranty was brought "into its final, legally enforceable form" only when it was "given" or delivered to the bank.  According to that reading, South Carolina law would govern.  In concluding that the provision could have multiple interpretations, the Court notes that other courts and legal commentators have observed that the term "executed" can create confusion.  *See Sentinel Prods. Corp. v. Scriptoria, N.V.*, 124 F. Supp. 2d 115, 119 (D. Mass. 2000) (observing that "the meaning of the elusive term 'executed' depends on context"); Black's Law Dictionary 609 (citing William R. Anson, *Principles of the Law of Contract*, 26 n.* (Arthur L. Corbin ed., 3d Am. ed. 1919) ("[T]he term 'executed' is a slippery word. Its use is to be avoided except when accompanied by explanation.  A contract is frequently said to be executed when the document has been signed, or has been signed, sealed, and delivered.")).  Because the Court finds that the

term "executed" as used in Paragraph 13 is susceptible of more than one interpretation, the Court concludes that the choice of law provision is patently ambiguous.

Under South Carolina law, when a contract term is patently ambiguous, the interpretation of the contract is a question for the court. *Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d at 95. Moreover, South Carolina courts have adopted the general rule of contract construction holding "that an ambiguity in a written contract should be construed most strongly against the drafters." *Myrtle Beach Lumber Co. v. Willoughby*, 274 S.E.2d 423, 426 (S.C. 1981); *see Duncan v. Little*, 682 S.E.2d 788, 791 (S.C. 2009) (explaining that had the lease agreement contained an ambiguity, "such ambiguity would have to be construed against the Bank which drafted the agreement"). It is undisputed that CresCom drafted the Guaranty Agreements; therefore, the Court must construe the choice of law provision most strongly against CresCom. Accordingly, the Court finds that Terry's reading of "executed" as used in the choice of law provision controls. Because Terry signed the Guaranties in Georgia, the Guaranties are governed by Georgia law.[2]

---

[2] CresCom argues that under either South Carolina or Georgia's choice of law rules, the *lex loci contractus* with regard to the Guaranty is the place of delivery because it was the delivery that rendered the Guaranty effective. However, because the parties included an express choice of law provision in the Guaranty, the Court cannot apply the traditional choice of law principle. See *Team IA*, 717 S.E.2d at 109 (observing that in South Carolina, "traditional choice of law rules apply only in the absence of an express provision regarding the applicable law to govern the contract"). CresCom also argues that Terry's focus on the one-sentence provision fails to consider the entirety of the loan transaction, the notes and mortgages (which include choice of law provisions specifying South Carolina law), the place of performance, the *in rem* issues relating to the security, and the interests of the various states. However, CresCom's claim against Terry is based on a breach of the Guaranties and does not concern the other loan documents or the real estate collateral. Moreover, the terms of the notes and mortgages were not incorporated into the Guaranties. Accordingly, the Court will not consider these documents in interpreting the choice of law provision in the Guaranty Agreements. *See Beaufort Cnty. Sch. Dist.*, 709 S.E.2d at 95 (explaining that "extrinsic evidence may not be considered if the ambiguity is a patent ambiguity"). Finally, although CresCom argues that South Carolina has a greater interest in enforcing the Guaranties than Georgia, CresCom has neither alleged nor demonstrated that application of Georgia law in this case would result in a violation of South Carolina public policy. See *Nucor Corp.*, 482 F. Supp. 2d at 728 ("[A] choice-of-law clause in a contract will not be enforced if application of foreign law results in a violation of South Carolina public policy."). Accordingly, the Court concludes that, pursuant to the Guaranties' choice of law provision, Georgia law governs the Guaranties.

## II.    Terry's Motion for Summary Judgment

In both his motion for summary judgment and his response to CresCom's motion, Terry argues that the Court should dismiss the claims against him because (1) this Court lacks personal jurisdiction over Terry; and (2) Terry's obligations under the Guaranty Agreements were discharged by virtue of CresCom's failure to properly provide written notice of default and an opportunity to cure, as required under Georgia law.  Alternatively, he argues that the Court should find that under the principles of collateral estoppel and res judicata, the total amount of the debt owed to CresCom was reduced to a maximum of $1,121,029.00 by virtue of the orders of the Bankruptcy Court.  Finally, he contends that CresCom is barred from recovering attorneys' fees because it failed to provide notice of its intent to pursue such fees as required under Georgia law.  The Court will address these arguments in turn.

### A.  The Court has personal jurisdiction over Terry

When personal jurisdiction is challenged by the defendant, the plaintiff has the burden of showing that jurisdiction exists.  *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997).  "[T]o validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied." *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).  First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and second, the exercise of personal jurisdiction must not "overstep the bounds" of Fourteenth Amendment due process.  *Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 317 (4th Cir. 2000).  South Carolina's long-arm statute has been construed to extend to the outer limits allowed by the Due Process Clause.  *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002).  Thus, the scope of the court's inquiry is whether defendants have "certain minimum contacts" with the forum, such that "maintenance of the suit

does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted).

A defendant has minimum contacts with a jurisdiction if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Under this standard, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

The analytical framework for determining whether minimum contacts exist differs according to which species of personal jurisdiction—general or specific—is alleged.  *See generally ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623-24 (4th Cir. 1997).  When a cause of action arises out of a defendant's contacts with the forum, a court may seek to exercise specific jurisdiction over a defendant who purposefully directs activities toward the forum state and the litigation results from alleged injuries that arise out of or relate to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).  However, when the cause of action does not arise out of the defendant's contacts with the forum, general jurisdiction may be exercised upon a showing that the defendant's contacts are of a "continuous and systematic" nature.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

The Fourth Circuit has applied a three-part test when evaluating the propriety of exercising specific jurisdiction:  (1) whether and to what extent the defendant purposely availed itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claims arise out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable."  *Nolan*,

259 F.3d at 215-16 (citing *Helicopteros*, 466 U.S. at 414-16, and *Burger King*, 471 U.S. at 472, 476-77).

The Supreme Court has made clear that an out-of-state party's contract with a party based in the forum state cannot "automatically establish sufficient minimum contacts" in the forum state. *Burger King*, 471 U.S. at 478.  Instead, the court must perform an individualized and pragmatic inquiry into the surrounding facts of the disputed contractual relationship to determine "whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479.  Although the test for purposeful availment can be somewhat imprecise, significant factors typically include: (a) whether the defendant maintains offices or agents in the forum state; (b) whether the defendant owns property in the forum state; (c) whether the defendant reached into the forum state to solicit or initiate business; (d) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (e) whether the parties contractually agreed that the law of the forum state would govern disputes; (f) whether the defendant made in-person contact with the resident of the forum state in the forum state regarding the business relationship; (g) the nature, quality, and extent of the parties' communications about the business being transacted; and (h) whether the performance of contractual duties was to occur within the forum. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).  Underlying these factors is the central question of whether each defendant has performed purposeful acts in the forum state such that the defendant has created a substantial relationship with the forum state. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000).

Terry initially challenged personal jurisdiction in this case in a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2).  At the time, the Court concluded that,

based on the pleadings and affidavits before the Court, CresCom had met its burden of establishing a prima facie showing of personal jurisdiction. *See* July 31, 2012 Order, Dkt. 18. Upon review of the complete, post-discovery record, the Court reaffirms its conclusion that it has personal jurisdiction over Terry in this matter.

The evidence in this case reveals that Terry purposefully availed himself of the privileges of conducting activities in South Carolina by entering into contracts with a South Carolina bank and securing those contracts with South Carolina property.[3] Terry signed all of the relevant loan agreements as an authorized signatory for, and the sole member of, Harris Street, Sugarloaf, and CCT. Moreover, Terry was an authorized signatory on multiple accounts at the bank, held in the name of entities in which he holds an interest. Additionally, Terry made telephone and other communications directly to officers and employees of the bank on multiple occasions with regard to the obligations under the notes, related mortgages, and the Guaranties. Terry made personal visits to the bank in Charleston to meet with officers, agents, and/or employees of the bank and met on multiple occasions with the same relating to obligations under the notes, mortgages, and Guaranties. These contacts are sufficient for this Court to assert jurisdiction over Terry. *See State Bank of Alleghenies v. Hudnall*, No. 94–1809, 1995 WL 469445, at *2 (4th Cir. Aug. 9, 1995) (affirming jurisdiction and finding sufficient contacts where guarantor acted with apparent authority of borrower, called the Virginia bank at least once to inquire about collateral, provided financial statement to the Virginia bank, and signed a Virginia loan guaranty for a Virginia business); *Cozi Invs. v. Schneider*, 252 S.E.2d 116, 118 (S.C. 1979) (affirming jurisdiction and finding that the acts of the guarantors in executing the guaranty clearly brought

---

[3] The following facts are drawn from the affidavit of Jamin M. Hujik, the Vice President of CresCom Bank. *See* Hujik Affidavit, dkt. 14-1.

them within the parameters of the long-arm statute in that they entered into a contract to be performed in whole or part by either party in South Carolina).

Furthermore, CresCom's claim against Terry for breach of the Guaranties arises out of the forum-related activities discussed above.   Additionally, the Court reaffirms its prior conclusion that exercising jurisdiction over Terry comports with fair play and substantial justice and is constitutionally reasonable.  *See* July 31, 2012 Order (finding that the burden on Terry is reasonable, that South Carolina has an important interest in adjudicating a dispute involving guaranties of loans issued by one of its banks for the purpose of developing land in South Carolina and secured by property in South Carolina, and that CresCom has an interest in obtaining convenient and effective relief in South Carolina).  Accordingly, the Court holds that it has personal jurisdiction over Terry in this matter, and it denies Terry's motion with respect to this issue.

### B.  Terry's obligations under the Guaranty Agreements have not been discharged

Terry next argues that his obligations under the Guaranty Agreements were discharged because CresCom failed to comply with both the terms of the loans and Georgia law.  According to Terry, CresCom failed to provide the borrowers with written notice of default or an opportunity to cure any default, as required under the Loan Amendment.  *See* June 25, 2009 Loan Amendment ¶ 2, Dkt. 51-37 ("In the event Lender determines to exercise its rights hereunder it shall give Borrowers no less than ten (10) days written notice from the date of the receipt of the notice to cure the default."); *id.* ¶ 5 ("[A]ny notices that are to be sent to any of the parties regarding a default under the terms set forth herein . . . shall be given by certified mail, . . . . UPS or FEDEX, [etc.]").  He cites Georgia law for the proposition that failure to give notice of default and an opportunity to cure as required under a contract bars recovery under the contract.

13

*See In re Colony Square Co.*, 843 F.2d 479, 481 (11th Cir. 1988) (applying Georgia law); *Orkin Exterminating Co. v. Stevens*, 203 S.E.2d 587, 593 (Ga. Ct. App. 1973).

CresCom's claim against Terry, however, is not based on a breach of the promissory notes or an attempt to recover under those notes; instead, it is based on a breach of the Guaranty Agreements. The Guaranty Agreements do not contain any provision requiring notice of default or an opportunity to cure. Instead, as guarantor, Terry expressly and unambiguously waived "presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing indebtedness." Guaranty ¶ 11. Moreover, Terry expressly and unambiguously waived all defenses of the Borrower, except the defense of discharge by payment in full.[4] Under Georgia law, if the trial court determines that the contract language is clear and unambiguous, "the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning." *City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381, 389 (Ga. 2013). Moreover, "Georgia law is clear that creditors are entitled to summary judgment in a suit on an unconditional guaranty when the guarantor has waived all of his defenses. It is also axiomatic that competent parties are free to choose, insert, and agree to whatever provisions they desire in a contract unless prohibited by statute or public policy." *Core LaVista, LLC v. Cumming*, 709 S.E.2d 336, 340-41 (Ga. Ct. App. 2011) (quotations and citations omitted)

---

[4] Paragraph 7 of the Guaranty Agreements provides:

> The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge of payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any indebtedness, or any setoff available against Lender to Borrower or any such other person, whether or not on account of a related transaction. The Undersigned expressly agrees that the Undersigned shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing indebtedness, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The undersigned shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though the Borrower's obligations had not been discharged.

(holding that guarantor was bound by the broad waiver of defenses in the Guaranty where the waiver was plain, unambiguous, and capable of only one interpretation). Therefore, even assuming *arguendo* that CresCom's claims against CCT would be barred for failure to give notice of default and an opportunity to cure, such failure has no effect on CresCom's claims against Terry as guarantor because he waived this defense.[5] Accordingly, the Court concludes that Terry's obligations under the Guaranty Agreements have not been discharged as a matter of law and denies Terry's motion with respect to this issue.

### C. CresCom's recovery is not limited to a maximum of $1,121,029.00

Terry contends that CresCom's recovery under the Guaranty Agreements is limited to $1,121,029.000, which is the amount of CresCom's remaining unsecured or deficiency claim against CCT as determined by the Order of the Bankruptcy Court. This amount appears to be the difference between the total principal payments due on the notes ($3,672,029.00) minus the bankruptcy valuation of the land conveyed to CresCom pursuant to its secured claim against CCT ($2,551,000.00). Terry maintains that the Bankruptcy Court's determination that CCT's remaining debt is $1,121,029.000 is binding upon CresCom under the principles of collateral estoppel and res judicata. CresCom responds that under well-established bankruptcy law principles as well as the express terms of the Guaranty Agreements, the order of the Bankruptcy Court did not limit Terry's liability to a maximum of $1,121,029.00. The Court agrees with CresCom.

---

[5] The Court notes that although Terry cites Georgia law for the purposes of interpreting the Loan Agreements, the express and unambiguous language of the promissory notes and the mortgages provide that South Carolina governs those documents. *See, e.g.*, June 25, 2009 Note 3572, Dkt. 51-29 ("The law of the state of South Carolina will govern this note."); June 25, 2009 Mortgage ¶ 25, Dkt. 51-36 ("The Mortgage is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located.").

Under the Bankruptcy Code, the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e); *see In re Hayden*, 477 B.R. 260, 264 (Bankr. N.D. Ga. 2012) ("A discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt.").  Thus, the discharge of a debtor in bankruptcy proceedings does not affect a guarantor's liability.  *NCNB Tex. Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994).

Courts routinely reject guarantors' arguments that creditors are barred by the doctrines of res judicata or collateral estoppel from seeking the full amount of debt secured by the guaranty agreement where a bankruptcy court's order reduced or discharged the debtor's debt.  *See C.F. Trust, Inc. v. Peterson*, 13 F. App'x 161, 165-66 (4th Cir. July 10, 2001) (affirming district court's decision not to give res judicata effect to the bankruptcy court's final report order, which allowed a reduction of creditor's unsecured claims against debtor, where district court found that the reduction had no effect on guarantor's independent obligation as guarantor to pay the entire debt); *United States v. Stribling Flying Serv., Inc.*, 734 F.2d 221, 223 (5th Cir. 1984) (rejecting guarantors' argument that the bankruptcy court's confirmation order reducing debtor's liability acted as collateral estoppel or res judicata as to a claim against the guarantor on the original debt); *Wells Fargo Bank, N.A. v. Young*, No. 6:1-cv-1130-Orl-31DAB, 2011 WL 4054786, at *3 (M.D. Fla. Sept. 13, 2011) (where the guaranteed debt was adjudicated fully satisfied in the bankruptcy proceeding, court rejected guarantors' argument that res judicata barred creditor's claims against guarantors because guarantors had failed to show that the amount due on the guaranties was determined by the bankruptcy court).  Unless "the bankruptcy court makes a specific finding regarding the release of a third party's claim," the liability on an unconditional

16

guaranty is unaffected by a Chapter 11 plan restructuring the guaranteed debt. *Wells Fargo Bank*, 2011 WL 4054786, at *2.

Nowhere in the Bankruptcy Court's orders is there a specific finding regarding the release or reduction of CresCom's guaranty claim against Terry. Moreover, pursuant to the terms of the Guaranty Agreements, Terry "waive[d] any and all defenses, claims and discharges of Borrower, . . . pertaining to Indebtedness, except the defense of discharge by payment in full," and he expressly agreed not to assert against CresCom any defense of res judicata. Guaranty ¶ 7. Additionally, Terry agreed that he "shall be and remain obligated to pay Indebtedness[6] even though any other person obligated to pay Indebtedness, including Borrower, has such obligation discharged in bankruptcy or otherwise discharged by law." *Id.* ¶ 8. Thus, because the Bankruptcy Court's orders did not specifically discharge Terry's liability under the Guaranty Agreement, and because Terry waived the defenses of res judicata and collateral estoppel while agreeing to remain obligated to pay Indebtedness, the Court finds that CresCom's claim is not limited to a maximum of $1,121,029.00. Accordingly, the Court denies Terry's motion with respect to this issue.

### D.  Under Georgia law, CresCom is barred from recovering attorneys' fees

In its motion for summary judgment, CresCom seeks $150,000 in attorneys' fees. The terms of the Guaranty requires the guarantor to "pay or reimburse [CresCom] for all costs and expenses (including reasonable attorneys' fees and legal expense) incurred by Lender in connection with the protection, defense, or enforcement of" the guaranty. Guaranty ¶ 5. Terry, however, argues that CresCom should be barred from recovering any attorneys' fees because of

---

[6] "'Indebtedness' shall include post-bankruptcy petition interest and attorneys' fees and any other amounts which Borrower is discharged from paying or which do not otherwise accrue to Indebtedness due to Borrower's discharge, and the Undersigned shall remain obligated to pay such amounts as though Borrower's obligations had not been discharged." Guaranty ¶ 8.

its failure to comply with the notice provisions of Ga. Code Ann. § 13-1-11(a)(3).  That statute

provides, in relevant part:

> (a) Obligations to pay attorney's fees upon any note or other evidence of indebtedness, in addition to the rate of interest specified therein, shall be valid and enforceable and collectable as a part of such debt if such note or other evidence of indebtedness is collected by or through an attorney after maturity, subject to subsection (b) of this Code section and to the following provisions: . . .
>
>> (3) The holder of the note or other evidence of indebtedness or his or her attorney at law shall, after maturity of the obligation, notify in writing the maker, endorser, or party sought to be held on said obligation that the provisions relative to payment of attorney's fees in addition to the principal and interest shall be enforced and that such maker, endorser, or party sought to be held on said obligation has ten days from the receipt of such notice to pay the principal and interest without the attorney's fees.  If the maker, endorser, or party sought to be held on any such obligation shall pay the principal and interest in full before the expiration of such time, then the obligation to pay the attorney's fees shall be void and no court shall enforce the agreement. . . .

Ga. Code Ann. § 13-1-11(a)(3).

The Georgia Court of Appeals recently held that "§ 13–1–11(a)(3) creates a mandatory

condition precedent to the debtor's obligation to pay attorney fees expended by the lender while

collecting on a note." *Core LaVista*, 709 S.E.2d at 342-43.  Georgia case law requires only

substantial compliance with § 13–1–11(a)(3).  *Id.* at 343.  Thus, "[s]o long as a debtor is

informed that he has 10 days from receipt of the notice within which to pay principal and interest

*without incurring any liability for attorney fees*, the legislative intent behind the enactment of

OCGA § 13–1–11(a)(3) has been fulfilled." *Id.* (emphasis in original).

In *Core LaVista*, the guarantor agreed to pay the lender all costs of collection (including

reasonable attorneys' fees actually incurred and litigation expenses) if an attorney assisted in

collecting on the note.  *Id.* at 342.  After the borrower defaulted on the note, the lender sent the

guarantor a letter notifying him of the default and requesting that the default "be cured

18

immediately." *Id.* The letter further advised the guarantor that the lender "intends to avail himself of all remedies available to him under the terms of the Note, the Security Deed, as well as the Unconditional Guaranty of Payment and Performance signed by you in connection with the extension of credit by Lender to Borrower." *Id.* The court held that the lender was not entitled to attorneys' fees because the demand letter sent to the guarantor did not state that the guarantor could avoid his obligation to pay attorneys' fees by curing the default within ten days of the notice. *Id.* at 343. Moreover, the court found that the debt instruments themselves, including the personal guaranty, did not satisfy the notice requirement because "the statute plainly requires a separate notice in writing *after maturity*." *Id.* (emphasis added). Accordingly, the court concluded that the trial court erred by awarding attorneys' fees. *Id.*

In the present case, CresCom has produced no evidence showing—nor has it alleged— that it provided written notice to Terry advising him that the provisions of the Guaranty Agreements relating to attorneys' fees would be enforced if Terry failed to pay the outstanding principal and interest within ten days from his receipt of such notice. Because such notice is a mandatory condition precedent to the recovery of attorneys' fees related to the collection of a note under Georgia law, CresCom is barred from collecting attorneys' fees in this matter. *See id.* Accordingly, the Court grants Terry's motion for summary judgment as to attorneys' fees.

### III. CresCom's Motion for Summary Judgment

CresCom moves for summary judgment on its breach of contract claim against Terry based on the Guaranty Agreements. To prevail on its claim for breach of contract, CresCom must show a (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken. *Kuritzky v. Emory Univ.*, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008). It is undisputed that neither Terry, as Guarantor, nor the Borrowers paid the

sums due on the loans when the loans matured on June 18, 2011. Thus, CresCom has established a breach of the Guaranty Agreements. Moreover, no one disputes that CresCom has the right to complain about the contract being broken. Accordingly, as a matter of law, CresCom has established the first and third elements of its claim.

CresCom requests an award of damages totaling $2,142,861.25 for all four loans, plus per diem interest at the rate of $355.67 per diem or 11% per annum.[7] In support of its request, CresCom filed an "affidavit of indebtedness" from its Executive Vice President in which he asserts that in addition to principal, the sum includes, *inter alia*, interest totaling $846,728.57 and "charges and fees" totaling $175,102.90 for all four loans. Terry objects to the evidence because the affidavit attaches no bank records to support the debt, interest, charges, or fees allegedly owed. Terry further complains that the affidavit indicates that CresCom used an interest rate of 11% for each loan even though the loan documents require different interest rates for different periods of time. Terry maintains that the evidence before the Court is not sufficient to prove damages. In its reply memorandum, CresCom did not address Terry's concerns.

The Court concludes that under the terms of the Guaranties, CresCom is entitled to damages resulting from the defaults at issue in this case and thus should be granted summary judgment. However, from the evidence presently available to the Court, the Court is unable to verify that the amount of damages described in the affidavit of indebtedness is the proper amount that should be awarded. *See Hanna v. First Citizens Bank & Trust Co.*, 744 S.E.2d 894, 899 (Ga. Ct. App. 2013) (holding that affidavit of the bank's senior vice president along with a printout reflecting the current amount owed were insufficient to support an award amount because the underlying business records were not in the case record). Accordingly, the Court orders

---

[7] CresCom has credited the outstanding balances of the respective loans in the amounts set forth in the Bankruptcy Court's Order entered March 14, 2013. Those amounts were credited on June 8, 2013, the date the deeds to the properties were received by CresCom's counsel in recordable form.

CresCom to file a brief supplemental memorandum with supporting evidence to document the basis for its calculation of damages. Terry will have five days from the date of CresCom's supplemental memorandum to file objections. Following review of the parties' supplemental submissions, the Court will issue an order determining the proper award of damages.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant Terry's Motion for Summary Judgment is **DENIED IN PART and GRANTED IN PART**. It is further **ORDERED** that Plaintiff CresCom's Motion for Summary Judgment is **GRANTED** in an amount to be determined after receipt of CresCom's supplemental memorandum, submitted to the Court within **10 days** from the date of this Order.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**October 1, 2013**
**Charleston, SC**